## JOHN DIBERT v. EDWARD D'ARCY, Trustee of THE F. H. SMITH LUMBER COMPANY, Appellant.

**Division One, March 15, 1913.**

1. **PLEDGE: Stock Exchange Sale: Trustee.** Where $90,000 par value of unissued bonds of a corporation, secured by a mortgage on the corporation's property, were delivered to a bank as collateral security for the corporation's notes for $45,000, under the bank's general contract of pledge, which authorized a sale of collateral on the stock exchange upon default in payment of the debt, and where, upon such default, the bank ordered its attorney to "take possession of the collateral," which he did by selling the bonds upon the stock exchange and having them bought in for the bank for $1800, it is *held* that the bank and others who take said bonds with notice hold them, not absolutely, but in trust for the benefit of the corporation after payment of the debt.

2. ————: **Bonds Secured by Mortgage.** Unissued bonds of a corporation, secured by a mortgage upon the corporation's property, and pledged by it as collateral for its notes, give the pledgee the benefit of the lien of the mortgage for the collection of his debt.

3. ————: **Construction of the Contract.** Where, as regards a contract of pledge, two constructions are equally available, that one ought not to be adopted which is most favorable to the pledgee.

4. **JUDICIAL NOTICE: Stock Exchange.** The stock exchange is so much a part of the financial method of our time that the Supreme Court takes judicial notice of its general nature.

5. **TRUST: Contract.** Whenever a person comes into the possession and control of the property of another, or of property in which another has an interest, he becomes, with reference to that interest, a trustee, and he must exercise such control with due regard to the interests of the beneficiary. And where

the trust is created and defined by contract the contract itself will be construed, in cases of doubt, favorably to the beneficiary.

6. **PLEDGE: Trust.** That the trust relation, with its consequent duties, exists between the pledgor and pledgee of collateral securities follows from the nature of the transaction. It is a trust for the protection of the debt, and the creditor holds the collateral as the trustee and agent of his debtor for that purpose.

7. ————: ————: **Duties of Pledgee.** If the duties of a pledgee, who is of course a trustee for the debtor, are defined by express contract, the terms of the contract answer all inquiry as to the nature and extent of the trust; but limitations in the contract upon the liability which the law would imply. against the pledgee must be plainly expressed; and fraud cannot be authorized by contract. The acts of the trustee must, however, be judged in each case by the facts and circumstances of that case.

8. ————: ————: **Bonds: Secured by Mortgage: Foreclosure and Sale.** Ninety thousand dollars par value of unissued bonds of the Hardwood Export Company, secured by a mortgage on the company's property, were delivered to a bank as collateral security for the corporation's notes for $45,000. These notes were written on the bank's "regular form of collateral note" containing a general contract of pledge which authorized the sale of collateral upon the stock exchange in default of payment of the debt. The Hardwood Company failed to pay the notes when due, and soon both it and its owning corporation, the Smith Lumber Company, made general assignments for the benefit of creditors. The bank ordered its attorney to "take possession of the collateral," which he did by selling the bonds upon the stock exchange and having them bought in for the bank for $1800. Next a syndicate was formed, composed largely of stockholders in the bank, which, with notice, bought through plaintiff, a member, the notes and bonds from the bank for $45,000. The syndicate then had the mortgage foreclosed by which the bonds were secured, and which covered over 28,000 acres of timber, 5000 acres owned in fee. Before the sale under foreclosure the plaintiff contracted with the holder of thirty-seven other bonds that he should be authorized to bid as much as $75,000 for the interest covered by the 127 bonds. He purchased that interest at the sale for $25,000, and paid for the syndicate's interest (that covered by the ninety bonds) with the bonds themselves and, he alleges, $38,000 cash additional. Still representing the syndicate, he formed a new lumber corporation and transferred the property to it, receiving therefor $100,000 in stock of the new corporation. He now sues to subject the property of the Smith Lumber Company, in the hands of the trustee under the

conveyance for the benefit of creditors, to the payment of the notes for which the bonds were pledged as collateral. *Held*, that the plaintiff cannot recover, since he, as the representative of the syndicate, never ceased to be a trustee for the debtor corporation as to the interest covered by the ninety bonds.

9. **BONDS: Unissued: Not Property.** Unissued bonds of a corporation are not property, except as regards the material of which they are made, and they do not pass in a transfer of that corporation's property and property rights.

10. ————: **Issued: Evidence of Debt.** Bonds are not the "property" of the debtor who has issued them. Bonds are evidence of a debt.

11. **CORPORATIONS: Rights and Liabilities of One Upon Purchase of Another: Debts.** Where one corporation becomes the owner of all the property of another, and that other has already delivered its unissued bonds, secured by a mortgage on all its property, as collateral security for its notes, its property is thereby pledged as security, and after the owning corporation has acquired the property it has the right to see that it is applied according to the terms of the pledge.

12. **PARTIES: Former Judgment: Estoppel: Pleading.** The party sought to be bound by a former judgment must not only be a party to both actions, but he must have appeared in both in the same capacity or character; and the defense of estoppel upon that ground must be pleaded in order to be available.

13. **ESTOPPEL: The Issues: Pleading.** The Smith Lumber Company became the owner of all the property of the Hardwood Export Company. The Hardwood Company had pledged ninety of its unissued bonds as security for its notes, and upon renewal of the notes the Lumber Company indorsed them. Upon default in payment of the notes the bonds were sold, bought in by the creditor bank, and sold by it to the plaintiff, who had the mortgage foreclosed against the Hardwood Company and then bought the property and turned it over to another corporation which he himself organized. He now sues to subject the property of the Lumber Company, in the hands of a trustee for the benefit of creditors, to the payment of the notes, and insists that the assignee is estopped from asserting that plaintiff is a trustee, because the assignee received the proceeds from thirty-seven other Hardwood bonds sold at the foreclosure sale. *Held*, that plaintiff's contention, lying as it does outside the issues, is not tenable; and besides, such defense in a suit of this character must be pleaded to be available.

14. **TRUST: Method of Valuing Trust Property.** Where the plaintiff, as trustee, turned certain property over to another corporation which he had organized for that purpose, taking in

return $100,000 par value of that corporation's stock, he cannot, under the circumstances of this case, be made to respond to his beneficiary in money on the basis of the value set by that transaction.

Appeal from St. Louis City Circuit Court.—*Hon. Matt G. Reynolds*, Judge.

REVERSED AND REMANDED (*with directions*).

*George L. Edwards* for appellant.

(1) The trial court erroneously decided the case on questions of *res adjudicata* and estoppel *in pais*, not raised by the pleadings or entered into at the trial. A defense of estoppel or of *res adjudicata* must be pleaded. Sanders v. Chartrand, 158 Mo. 161; Bray v. Marshall, 75 Mo. 327; Tyler v. Hall, 27 Am. St. 344; Noble v. Blount, 77 Mo. 235; Avery v. Railroad, 113 Mo. 561; Throckmorton v. Pence, 121 Mo. 50; Cockrill v. Hutchinson, 135 Mo. 67; Bank v. Doran, 109 Mo. 40; Spurlock v. Sproule, 72 Mo. 503; State v. Muench, 217 Mo. 124; Hudson v. Railroad, 101 Mo. 30; Nichols v. Stevens, 123 Mo. 96; Notes to Duchess of Kingston's Case, 2 Sm. Lead Cas. (8 Ed.), p. 951. Even where evidence of a defense not pleaded, improperly gets in, it will not be considered. Borkenhagen v. Paschen, 72 Wis. 272; 3 Hughes Grounds & Rudiments, 51; Van Stewart v. Miles, 105 Mo. App. 247; Cromwell v. County, 94 U. S. 351. Even had this defense been pleaded, the proof would not sustain the plea. Jones on Pledges (2 Ed.), secs. 657, 659; Jenkins v. Bank, 111 Ill. 462; Colby v. McOmber, 71 Iowa, 469; Burlingame v. Parce, 12 Hun (N. Y.), 149; Wells v. Wells, 53 Vt. 5; 22 Am. & Eng. Ency. Law (2 Ed.), 899, n. 4. (2) Where a trustee, though strictly honest, buys "for himself an estate from his *cestui que trust* and then should sell it for more, according to the rules of a court of equity, from general policy, and not from any peculiar imputation of fraud, he would be held still to remain a trustee to all intents and purposes,

and not be permitted to sell to or for himself." Michoud v. Girod, 4 How. 556; 1 Story Com. on Eq. (2 Ed.) 317; Fox v. Mackreth, 2 Bro. Ch. R. 400; Davoue v. Fanning, 2 Johns. Ch. 252; Thornton v. Irwin, 43 Mo. 168; Boardman v. Florez, 37 Mo. 559; Charleville v. Chouteau, 18 Mo. 493; Grumley v. Webb, 44 Mo. 444; Hardwick v. Jones, 65 Mo. 54; Euneau v. Rieger, 105 Mo. 659; Tuggles v. Callison, 143 Mo. 536. (3) Trustees have no right to deal with trust property for their own benefit; if the trustee does purchase property with the trust funds and takes title in his own name, a trust results for the benefit of the trust estate and the funds may be followed into the property in which they have been invested. Patterson v. Booth, 103 Mo. 413; Bent v. Priest, 86 Mo. 482; Newman v. Newman, 152 Mo. 398. And especially is this true where there are suspicious circumstances, like inadequacy of consideration, lack of notice, subsequent reconveyance to the trustee, etc. Smith v. Isaac, 12 Mo. 106; Stine v. Wilkson, 10 Mo. 76; Thornton v. Irwin, 43 Mo. 163. (4) The rule applies strictly to pledgees. They must act in the interest of the pledgor. Hagan v. Bank, 182 Mo. 319; Bank v. Richardson, 156 Mo. 270. (5) It matters not that the sale was made under judicial authority, where the circumstances are such as to raise a trust. Michoud v. Girod, 4 How. (U. S.) 553. No matter how great the profits realized by the trustee on a resale, they all belong to the beneficiary. Ex parte Lacey, 6 Ves. 627; Ex parte Bennett, 10 Ves. 394; Herbert v. Hanrick, 16 Ala. 581; Buell v. Buckingham, 16 Iowa, 284; Hannah v. Carrington, 18 Ark. 85. (6) The morality and policy of the law makes void a sale effected by the intervention of persons who are nominal buyers of the property for the purpose of conveying it to "the trustee." Such a transaction carries fraud upon the face of it. Michoud v. Girod, 4 How. (U. S.) 553; Warwick v. Vernon, 4 Ves. Jr. 411, 14 Ves. Jr. 504; Smith v. Isaac, 12 Mo. 109. The New

Orleans sale was therefore void for the reason that the bonds were sold by the pledgee *per interpositam personam,* and the title taken in the name of W. A. Mysing, a broker. And the respondent Dibert knew of this. Trevelyan v. Charter, 9 Bev. 140; Charter v. Trevelyan, 11 C. & F. 714; Lewis v. Hillman, 3 H. L. Cas. 607; Walsham v. Stainton, 1 DeG. Jo. & Sm. 678; M'Pherson v. Watt, 3 A. Cas. 254. (7) "It is generally true where the pledge remains in the possession of the pledgee after an invalid sale, he continues to hold it is as a pledge, subject to all of the rights of the pledgor identically as before the invalid sale." Tennent v. Ins. Co., 133 Mo. App. 354; Hagan v. Bank, 182 Mo. 343; 22 Am. & Eng. Ency. Law (2 Ed.), 892; Jones on Pledges (2 Ed.), sec. 741; Schaaf v. Fries, 90 Mo. App. 111; Sharp v. Bank, 87 Ala. 644. (8) The words of a contract of pledge are to be given a reasonable intendment in favor of the pledgor. Bank v. Richardson, 156 Mo. 270; Hagan v. Bank, 182 Mo. 319; Basye v. Ambrose, 28 Mo. 41. And the utmost good faith is required of the pledgee in exercising his rights, and consequently in interpreting them. (9) Had Dibert given express notice to the Lumber Company's trustee, that he proposed to act for himself only, he might thereby have relieved himself from his trust. Not having done so, he went into the bidding as appellant's trustee. Plucker v. Teller, 174 Pa. St. 534.

*Joseph W. Carroll, Walter H. Saunders* and *Leahy, Saunders & Barth* for respondent.

(1) The contract of pledge was a Louisiana contract, governed by Louisiana law, which was both pleaded and proved, and, therefore, must be construed by the Missouri courts as a Louisiana contract. (2) The sale of the collateral in this case was in exact accordance with the Louisiana law, and no public advertisement of said sale was required. The cases of Bank v. Richardson, 156 Mo. 270, and Hagan v. Bank, 182

Mo. 319, are distinguished *toto coelo* from the instant case. (3) Should the court hold the sale of the collateral on the New Orleans Stock Exchange invalid, the most that appellant can claim by way of relief is a right to a credit on the notes of the amount realized by respondent on account of the bonds held by him at the foreclosure sale of the property in Alabama, because the bonds pledged were the bonds of the Hardwood Export Company, the pledgor, and secured by a mortgage executed by said company, the pledgor. Easton v. Bank, 24 Fed. 523, 127 U. S. 532. Even when the pledged property is the mortgage of a third person the pledgee may acquire an absolute title to the property at a foreclosure sale, if the pledgor is a party to the foreclosure suit, as was the case here, or if the pledgor has been put upon notice that the pledgee will act in his own interest. Bloomer v. Sturges, 58 N. Y. 168; Plucker v. Teller, 174 Pa. St. 529. (4) Even should the pledgor have the right to disaffirm a sale of the collateral for any reason, he must do so by offering to redeem within a reasonable time and his failure to do so will operate as a ratification of the sale. Jones on Pledges (2 Ed.), sec. 637; Hill v. Finnigan, 77 Cal. 267; Hayward v. Bank, 96 U. S. 611; Oil Co. v. Marbury, 91 U. S. 587; Hardwood v. Railroad, 17 Wall. 79; Patterson v. Hewitt, 195 U. S. 309; Ross v. Barker, 58 Neb. 402. (5) Even if both the New Orleans Stock Exchange sale and the foreclosure sale in Alabama did not terminate the rights of the pledgor, still the respondent and his associates would hold their stock in the Mt. Vernon Hardwood Company as collateral on the three notes and subject to redemption by the pledgor, upon payment of the full amount of the notes, principal and interest, and additional costs and expenses to which respondent and his associates have been subjected in regard to the property, and respondent would still be entitled to his dividend from the insolvent estate of the F. H. Smith Lumber Company.

Smith v. Bunting, 86 Pa. St. 116. In the Hagan case the pledgee sold the stock and accepted the purchaser's note for the purchase price of $30,000. In the instant case no change was made in the ownership, except that the property was conveyed to a corporation in which respondent and his associates took certificates of stock. (6) In no event can the appellant in this case assert a claim against respondent. Such claim can only be asserted by the Hardwood Export Company or its trustee, neither of whom is a party to this suit. Unissued bonds are not property. Eaton v. Bank, 127 U. S. 532. The Hardwood Export Company was a distinct legal entity from the F. H. Smith Lumber Company and the contract of pledge was made by the Export Company and not by the Lumber Company. Pullman Company v. Railroad, 115 U. S. 587; Conley v. Alkali Works, 190 U. S. 406. The F. H. Smith Lumber Company was neither party nor privy to the contract of pledge, and therefore can assert no rights thereunder. Even if it had any rights, which is denied, it is expressly stipulated that the pledge was made with its "knowledge and consent." It, therefore, can claim no greater rights than the Hardwood Export Company would have. (7) The decree in the Alabama foreclosure suit is *res adjudicata*. The decree provided that thirty days should be given to defendants in that suit to redeem, and no redemption was attempted. This decree is entitled to full faith and credit under the provision of the Federal Constitution (art. 4, sec. 1), which was pleaded and proved by both plaintiff and defendant. This established an estoppel by judgment. Cooley's Constitutional Remedies (7 Ed.) p. 38; Hanley v. Donoughue, 116 U. S. 1; 13 Am. & Eng. Ency. Law, pp. 974, 981, 983; 6 West Mo. Dig., "Foreign Judgments," columns 9441-9442; Crim v. Crim, 162 Mo. 544; 2 Freeman on Judgments (4 Ed.), p. 959; Mills v. Duryee, 7 Cranch. 484. (8) There was an express ratification of the Alabama foreclosure

proceeding by reason of the fact that the appellant participated therein and profited thereby. Martin v. Webb, 110 U. S. 7; Safe Deposit and Trust Co. v. Telegraph Co., 36 Fed. 288; Culver v. Ashley, 19 Pick. 300; Wilson v. Poulter, 2 Strange, 259; Loan & Trust Co. v. Walworth, 1 Const. (N. Y.) 433; Wallace v. Lawyer, 90 Ind. 499; Bank v. Lumber Co., 54 Mo. App. 327; Norton v. Bull, 43 Mo. 133.

BROWN, C.—This is a proceeding by the plaintiff and appellee to subject the property of the F. H. Smith Lumber Company in the hands of Edward D'Arcy, the surviving trustee under a conveyance by the company for the benefit of its creditors, to the payment of certain notes. The conveyance under which appellant holds the property is called by both parties a common law assignment. As there is no question raised as to the liability of the assignee for the debts of the Lumber Company it is not necessary to inquire further what this may mean. The original assignees under this instrument were Charles E. Fritsche and Patrick B. Little. At the time of the institution of this suit in March, 1906, Charles E. Fritsche was made a party defendant as the sole surviving trustee under the assignment. D'Arcy succeeded him and was on December 4, 1906, the date of the trial, substituted in his stead. On December 11, 1906, the plaintiff by leave of court filed the amended petition which is described in the record as the "fifth amendment," and is the one on which the cause is proceeding. It is founded on three promissory notes executed October 16, 1903, to the Interstate Trust & Banking Company of New Orleans, Louisiana, signed by the Hardwood Export Company, as follows:

One for $5000, payable on or before November 15th after date, with interest at the rate of seven per cent per annum; one for $5000, payable on or before

December 15th, bearing the same rate of interest; and one for the sum of $35,000, payable on or before December 27th, with interest at the same rate. All these notes were indorsed by the F. H. Smith Lumber Company, and the one last described by O. H. L. Wernicke. All were secured by the pledge of ninety first mortgage five per cent gold bonds, each of the denomination of $1000, dated March 17, 1902, executed by the Hardwood Export Company and secured by its deed of trust to the Northern Trust Company and Arthur Hurtley of Chicago, Illinois, covering all its property. These notes were written on the "regular form of collateral note" of the payee bank, and contained the following contract of pledge.

"The undersigned have deposited with and pledged to the Interstate Trust and Banking Company and assigns (with the privilege of sub-pledging or re-pledging same) as collateral security for the payment of the above and foregoing note, as well as all other liabilities whether absolute, contingent or conditional, of the undersigned to said Trust Company, or its assigns, heretofore or hereafter contracted, the following property, viz.:

"$100,000 Mortgage Bonds—Harwood Export Co. for this note and other obligations.

"The estimated market value of which is now $ . . . In case said Trust Company or any of its officers, agents or assigns, shall at any time be of opinion that said property is of less value than above stated, or that the whole or any part of said property has declined or may decline, in value, or at any time and for any reason may desire additional or other collaterals or security, or in the event of default in the payment of said note or all or any liability aforesaid or the interest thereon, at maturity, then in all, any or either of such cases, said Trust Company, or its assigns, may, in its or their discretion, call for additional or other collaterals or security satisfactory to

said Trust Company or to the holder of said note, and failure to furnish the same before twelve o'clock noon of the day next after the day of such call shall make said note and all other liabilities of the undersigned to said Trust Company, or its assigns, without further notice or demand, or putting in default, at once due and payable. Said call for additional security may be made by giving the undersigned, or any or either of them, oral or written notice thereof, or by leaving written notice thereof at any office, place of business, or usual abode of the undersigned, or any or either of them or by mailing same in sealed envelope, postage prepaid, addressed to the undersigned or any or either of them, at the last known postoffice address. The undersigned hereby gives said Trust Company or any of its officers, agents, or assigns full and irrevocable power, upon any such default, to furnish additional or other satisfactory security or collateral, as aforesaid, or upon failure to promptly pay at maturity said note or other liabilities aforesaid and the interest thereon, to sell such property or collaterals without further notice, demand for payment, or putting in default, and without the intervention of any court of justice, and without appraisement or advertisement or other notice, at public or private sale or sales, or at any brokers' board or stock exchange. If said sale or sales shall be public or at any brokers' board or stock exchange, the undersigned agree that said Trust Company or its assigns may purchase said property or any part thereof, at such sale or sales, without any right of redemption on the part of the undersigned. The net proceeds of such sale or sales, after payment of all expenses and attorneys' fees growing out of or connected with said property and the sale and delivery thereof, may be applied upon all or any of the liabilities (whether by the terms thereof due or not) of the undersigned to the holder of said note, and the surplus, if any, shall be paid to the undersigned. If the

net proceeds of such sale or sales shall not pay in full all the liabilities of the undersigned to said Trust Company or its assigns, then all such liabilities remaining unpaid shall become at once due and payable, and bear interest at the rate of eight per cent per annum from the time of such sale. In case of any exchange of, or substitution for, or addition to said property or any part thereof, the provisions of this agreement shall extend to such new, exchanged, substituted or additional property. And the undersigned hereby authorize said Trust Company, at any time, at the discretion of any officer or agent thereof, to apply any money or moneys which said Trust Company may have or hold on deposit or otherwise, for the undersigned, towards the payment of said note and other liabilities, whether due or not. The word liabilities herein shall include all liabilities of undersigned, whether of same class as said note or otherwise, and whether of undersigned alone or jointly or *in solido* with others."

There were originally, in this transaction, three $5000 notes, one of which was paid at maturity and $10,000 in par value of bonds withdrawn, leaving the three notes and $90,000 of bonds which constitute the bone of contention in this case.

The petition states that the defendant Lumber Company is a corporation organized under the laws of the State of Missouri; that the Hardwood Export Company is a corporation organized under the laws of Illinois, and is a subsidiary company of the Lumber Company, which in fact owned and controlled it; that the Interstate Trust and Banking Company is a trust and banking company doing business in New Orleans, Louisiana, and acquired the notes for value in the due course of buisness; that default was made in the payment of the notes, and the trust company "realized" on the collateral bonds by sale thereof upon the New Orleans Stock Exchange on January 21, 1904, in ac-

cordance with the contract of pledge and the Louisiana law governing such transactions, and bid in the collateral at said sale and thereby became the absolute owner thereof.  It also pleaded article 3165 of the Revised Civil Code of Louisiana, 1907, as amended, providing that "in all pledges of movable property, or rights or credits, stocks, bonds or other movable property, it shall be lawful for the pledgor to authorize the sale or other disposition of the property pledged, in such manner as may be agreed upon by the parties without the intervention of courts of justice."   Also article 1901 of said code as follows:   "Agreements legally entered into have the effect of laws on those who have formed them.

"They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

"They must be performed with good faith."   It also invokes the assistance of article 4, section 2, and the Fourteenth Amendment to the Federal Constitution, and section 30, article 2 of the Constitution of Missouri.   It further states:   "That on the 23rd day of February, 1904, said plaintiff purchased said notes and said ninety bonds for value from said Interstate Trust & Banking Company and acquired its title, namely, that of an innocent holder for value before maturity of said three notes and thereby became vested with all rights of such a holder, and is now the holder of said notes and also acquired its title to said bonds."

That on the 24th day of December, 1903, the Lumber Company in the city of St. Louis and the Hardwood Company in Illinois, each severally executed "a common law deed of assignment" for the benefit of all its creditors, to Patrick B. Little and Charles E. Fritsche, and that the defendant D'Arcy has become the successor of the above said assignees with respect to the assignment of the Lumber Company, while J. C. McKinnon succeeded Little as one of the assignees of

the Hardwood Export Company. These deeds con-
veyed all the assets of the respective assignors and
were duly accepted by all their creditors; that there-
after the assets of the Hardwood Export Company
were sold in a proceeding in the chancery court of
Washington county, Alabama, to foreclose the mort-
gage securing the bonds, and that plaintiff realized
from said sale $13,919.36; that the plaintiff is a cred-
itor of the Lumber Company to the extent of the ag-
gregate amount due on the three notes, namely, about
$50,328; that Fritsche has distributed a part of the
estate of the Lumber Company among its creditors and
declines to recognize the plaintiff's claim, and now has
in his hands $25,000 for distribution which he is about
to pay out to other creditors, to plaintiff's irrepara-
ble injury; that he has no adequate remedy at law, and
asks an injunction to preserve the fund, for judgment
for the amount of his claim, and other relief. The
temporary injunction was granted. The answer states
by way of counterclaim, that, five or six months prior
to the 16th day of October, 1903, the Lumber Com-
pany acquired practically all the stock of the Hard-
wood Company and all its property and property
rights of every kind and description, wheresoever lo-
cated, and continued to own said stock and property
and property rights up to and at the time of the exe-
cution of the deed of assignment for its creditors.
That among the things so acquired were ninety bonds
involved in this suit, which were secured by mortgage
covering all the property of the Hardwood Company
wheresoever located. That the notes in question were
made and the bonds, which were then worth par, were
pledged to secure their payment, with the consent of
the Lumber Company. It then sets out the contract
of pledge, the default in the payment of the notes and
that the Interstate Trust & Banking Company pre-
tended and claims to have sold the bonds on January
21, 1904, on the New Orleans Stock Exchange, and then

and thereafter claimed by virtue of said sale to be their absolute and unconditional owner; that on February 23, 1904, in consideration of the payment of the full amount due upon the three notes it indorsed and assigned them, together with the bonds, to plaintiff, who was then familiar with and had full knowledge of the condition of the title of the Interstate Trust Company, and the manner, method, facts and circumstances of the pretended sale through which it claimed title; that the sale was illegal and void; (1) because no notice was given to either of the parties to the note; (2) because it was a pretended public sale, but was made upon the New Orleans Stock Exchange, a corporation maintaining a board to which members only have access for the purpose of buying and selling securities; (3) because the seller made no announcement at any time of the terms, conditions or purpose of the sale, nor for whom or by what authority it was made, nor who was the owner or pledgee, nor of the nature or value of the bonds; (4) that they were well worth their face value while they were sold for the grossly inadequate sum of $1800; (5) that the Trust & Banking Company otherwise disregarded the terms of the contract and the interest of the pledgor in pretending to make the sale; all of which was done with the intention and purpose on its part to fraudulently acquire, without consideration, the title to the bonds and still hold the maker and indorsers upon the notes to the payment thereof, and thus through fraud and wrong to obtain for itself the bonds without consideration; that none of the parties to the notes had notice of the intention of the payee to make the pretended sale, and none of them were present at the sale or members of the exchange, and would not have been permitted to be present had they known; that the property mortgaged to secure the payment of the bonds was reasonably worth $150,000.    That plaintiff after acquiring the notes and bonds from the Interstate Trust & Banking

Company requested the trustees in the mortgage to foreclose and have the mortgaged property sold, and thereupon proceedings were taken by the trustees in the chancery court of Washington county, Alabama, for that purpose, and prosecuted to a decree of foreclosure, entered on the 19th day of November, 1904, whereby all the property covered by the mortgage was ordered to be sold on December 27th following, by the register of the court. By this decree it was provided that any one or more of the holders of the bonds might purchase the property at the sale, and in such case pay into the court the full amount bid by them after deducting therefrom such dividends as might be due and coming to the purchaser on bonds held by him and deposited with the register. That with a view to purchase said property the plaintiff, on December 5, 1904, made a contract with John A. Lewis, trustee, whereby it was agreed that plaintiff would buy the property at such sale for the joint account of himself and Lewis in the proportions of 90/127 for plaintiff and 37/127 for Lewis. That in pursuance to said contract the plaintiff bid for said property at the sale the sum of $25,000, and being the only bidder it went to him for that price. That Lewis paid plaintiff 37/127 of the purchase price, and with it, and by delivering the ninety bonds so held by him to the register of the chancery court for cancellation, plaintiff paid the entire purchase price of the property and received a good and sufficient register's deed therefor.

That on March 26, 1906, the plaintiff sold said property to the Mount Vernon Lumber Company, afterward the Mount Vernon Hardwood Company, a Louisiana corporation, for $100,000, thereby receiving as the proceeds of said ninety bonds $70,866.14, for which, after deducting any balance owing on the three notes, plaintiff should be required to account to defendant. It asked judgment that the sale on January 21, 1904, on the New Orleans Stock Exchange was void

and inoperative; that the Interstate Trust & Banking Company held the bonds thereafter in the same right and capacity in which it held them prior thereto; that when plaintiff acquired them from the said Trust & Banking Company he acquired them in the same right and capacity, with like right and power and subject to the same duties and obligations as the Trust & Banking Company; and for an accounting and decree upon that basis.

The plaintiff filed a reply in which he admitted the most of the things charged in the counterclaim, including the acquisition and ownership by the Lumber Company of the stock and property of the Hardwood Export Company, the assignment of the latter company, the sale on the New Orleans Stock Exchange, the foreclosure, at his request, of the mortgage securing the bonds of the Hardwood Export Company and transfer of the property purchased by the plaintiff at the sale to the Mount Vernon Lumber Company, but denied all manner of fraud and illegality in any of the proceedings. He states that he paid for the bonds, the value of which was purely speculative, and the notes sued on, the full amount due on the notes, together with the expense to which the Interstate Trust & Banking Company had been put in connection with the transaction, amounting to about $47,000, and thereby became the absolute and legal owner of both the promissory notes and bonds for himself and in trust for persons associated with him in such purchase, and that at the time of acquiring them he was familiar with the title of the Trust & Banking Company and with the circumstances under which its title had been acquired, which he alleges to have been an absolute title as owner. That the action of the Trust & Banking Company in relation thereto was in good faith and in strict accordance with the terms of the contract under which the bonds had been pledged to it, and with the laws of the State of Louisiana. That while neither of

the parties to the notes was served with formal notice of the proposed sale of the bonds, a representative of the Trust & Banking Company had seen the president of the Lumber Company and Hardwood Export Company, and their assignees, and was informed by them that they neither would nor could do anything in regard to the payment of the notes and advised that the bank take such action to protect its interests as it might see fit; and that Mr. Wernicke, an indorser of the $35,000 note, had requested the bank to proceed against the collateral.    The bank was also advised about a month previous to the date of the sale that both the Hardwood Export Company and the Lumber Company had made assignments for the benefit of their creditors and were totally insolvent.    He admits the contract between plaintiff and Lewis and that Lewis paid him 37/127 of the purchase price bid at the foreclosure sale, and states that he paid for the property with the amount received from Lewis, the ninety bonds held by him, and $3800 in cash.    It also denies that he sold the property to the Mount Vernon Company for $100,000, or that he received from said property as the proceeds of the ninety bonds $70,866.14, and states that for about sixteen months after the foreclosure sale he and his associates tried to sell the property for an amount sufficient to recoup them their outlay on account of it and one of his associates offered defendant's counsel the whole interest of plaintiff and his co-owners in the property and notes for the amount he had paid out on account of same with interest.    This offer was unavailing, and plaintiff and his co-owners were obliged to try to realize their money by operating the property, and for that purpose organized the new corporation, to which it transferred the property for $100,000 worth of stock, which was divided among the co-owners in proportion to their respective interests, so that nothing was changed except the manner in which the property was owned.    That in the purchase

of the bonds and notes and all the property at the fore-
closure sale plaintiff and his associates had paid out
about $51,000 besides large expenses in the mainte-
nance and preservation of the property.

At the trial a stipulation which reiterates the ab-
solute ownership by the F. H. Smith Lumber Company
of all the stock, property and property rights of the
Hardwood Export Company, that the former company
continued to own the same up to the time of the assign-
ment, by which it passed to Little and Fritsche, the as-
signees of the Lumber Company, and that on the 16th
day of October, 1903, the Hardwood Export Company
with the consent of the Lumber Company executed the
notes sued on and secured the payment thereof by a
pledge of the ninety first mortgage five per cent gold
bonds involved in this proceeding, being a part of an
issue of one hundred and fifty such bonds dated March
17, 1902, and secured by the mortgage described and
admitted in the pleadings. Portions of the record in
the foreclosure were also introduced from which it ap-
pears that a reference was ordered by the court to as-
certain who were the holders of the bonds secured by
the mortgage, upon which it was reported that ninety
of the bonds had been presented by the plaintiff, thirty-
seven by Charles E. Fritsche, fifteen by the Jefferson
Bank of St. Louis, Missouri, and five by the Southern
Commercial Savings Bank of St. Louis, Missouri, the
bonds so presented being 147 of the 150 constituting
the entire issue. The register found that each of the
parties above named was the "true and lawful owner"
of the bonds so presented by them respectively. The
testimony of J. A. Lewis, stating that Fritsche, trustee
for F. H. Smith Lumber Company, was the owner of
the thirty-seven bonds, was returned with the report.
The complainants in the foreclosure proceeding were
the Northern Trust Company and Arthur Hurtley, the
trustees in the mortgage, while the defendants were
the Hardwood Export Company, John Dibert, the Cen-

tral Trust Company, C. Eugene Harrell, the German National Bank, Charles E. Fritsche and John C. McKinnon. Mr. McKinnon was successor of P. B. Little as assignee of the Hardwood Export Company, so that at the time of bringing the suit he and Fritsche were trustees under the deed of assignment of that company and were made defendants in that capacity. The other defendants besides the mortgagor, Fritsche and McKinnon, were made parties because they were complainants in proceedings pending in Alabama to set aside the assignment of the Hardwood Company as fraudulent. After the decree of foreclosure, and on December 5, 1904, the plaintiff and John A. Lewis made the following contract:

"This contract and agreement, made and entered into on this 5th day of December, A. D. 1904, by and between Mr. John Deibert, trustee, by his duly authorized attorney in fact, Sam Henderson, Jr., and Mr. John A. Lewis, trustee.

"Witnesseth: That said parties have entered into, with each other, the following agreements, to-wit:

"First: That John Deibert shall bid, at the sale under a decree of foreclosure in the case of Northern Trust Company et al. v. Hardwood Export Company et al., for the property to be sold by the register under said decree of foreclosure, at St. Stephens, Washington county, Alabama, such sum as may be necessary to buy said property, not to exceed the sum of seventy-five thousand dollars.

"Second: If said John Deibert shall buy said property, it shall be held and owned by him for the use and benefit of the parties hereto in the proportions of ninety one hundred-twenty-sevenths (90-127) for said John Deibert, trustee, and thirty-seven one hundred-twenty-sevenths (37-127) for John A. Lewis, trustee.

"Third: It is understood that said John Deibert shall have the right to bid more for said property

than the sum of seventy-five thousand dollars, but, in the event that he shall purchase said property for a price to exceed the sum of seventy-five thousand dollas, then it shall be for his own account and not for the joint account of the parties hereto as above provided.

"Fourth: It is agreed that John Deibert, as trustee, owns ninety (90) bonds of the Hardwood Export Company, secured by its deed of trust, dated March 17, 1902, and foreclosed by the judgment of the chancery court of Washington county, Alabama, by its decree entered on the 19th day of November, A. D. 1904, in the case of Northern Trust Company et al. v. Hardwood Export Company et al.

"Fifth: It is agreed that Charles E. Fritsche, as surviving trustee of the F. H. Smith Lumber Company, is the owner of thirty-seven (37) bonds of the Hardwood Export Company, secured by its deed of trust, dated the 17th day of March, A. D., 1902, and foreclosed by the chancery court of Washington county, Alabama, by its decree entered in the case of Northern Trust Company et al. v. Hardwood Export Company et al., on the 19th day of November, A. D. 1904.

"Sixth: It is hereby agreed that neither of the parties hereto shall make any objection to any claim of ownership of the bonds of the Hardwood Export Company hereby agreed to be owned by them respectively, which may be filed with the register of chancery in pursuance to the decree of the chancery court of Washington county, Alabama, entered on the 19th day of November, A. D. 1904, in the case of Northern Trust Co. et al. v. Hardwood Export Company et al."

It was in pursuance of this contract that plaintiff bid $25,000 at the foreclosure sale and the interest of the parties in the property purchased was fixed according to its terms.

Mr. Wallace B. Rogers was president of the Interstate Trust & Banking Company from the time of

its organization on July 1, 1902 to January 1, 1905, which covered the entire period of its connection with the transactions involved in this suit. He was also a member of the purchasing syndicate represented by the plaintiff, and was still, at the time he testified in this case, connected with the property as a director in the Mount Vernon Hardwood Company, its present owner, and was a witness for the plaintiff. He testified that the account of the Hardwood Export Company with the bank was opened in 1902, but it proved to be an account of loans rather than balances. For that reason, in the following summer, the bank called its loans, which amounted at that time to $50,000, secured by $100,000 of its bonds. Up to that time the bank had required no personal or other security than the bonds. Its paper was permitted to fall past due to give it time to arrange to move the entire loan. The bank had information that the F. H. Smith Lumber Company had taken in the Hardwood Export Company and was figuring with the Wernicke Land & Timber Company to take its property over, and Mr. Wernicke and Mr. Smith wanted to have the paper extended on the basis that Mr. Wernicke was not through with his examination, and it was agreed that the old notes should be taken up with those involved in this suit, to be indorsed by Wernicke and the Lumber Company, which was done. When these notes became due default was made in their payment, the Hardwood Export Company and Lumber Company assigned for the benefit of their creditors and Mr. Rogers proceeded to avail his bank of the collateral in a manner indicated in his testimony as follows:

"Q. Now, please state what led you to take the steps which you did, to have this pledge of those bonds foreclosed? A. Simply to clean the matter up; the party who made it was not in good standing financially and it was simply—we simply referred the matter to our attorney to take possession of the collateral.

"Q. What do you mean by taking possession?
A. Buying them in so we could get it outright as
property rather than hold it as collateral of a corpora-
tion that was no longer good. And the matter was
turned over to Mr. Spencer, the attorney of the bank,
to take possession of the property in legal form."

Mr. Rogers also said: "Q. You didn't tell him
what to pay for the bonds? A. No, sir, I told him to
take possession for the bank, and that was all there
was to it; it was up to him to handle the legal part;
I don't know anything about the legal phase of it."

Mr. Spencer, the lawyer of the bank, to whom Mr.
Rogers referred, testified: "As these were not listed
securities, I thought it advisable, as it might be nec-
essary for the bank to protect itself by buying these
securities in, to have them sold on the New Orleans
Stock Exchange. I employed Mr. Horatio Lange, who
was a broker on the New Orleans Stock Exchange,
to offer these bonds for sale, and in order to protect
the bank in case there were no bids for them, I in-
structed him to procure some other broker who should,
in the event that no offer be made for the bonds, to
offer some fixed sum, I do not remember the exact
figures that I told him, if no bid was received to bid
them in at. My recollection of the instructions to Mr.
Lange is, that he should offer these bonds at a price
which we had determined would be sufficient to pay the
debt with interest, that if he should get no bids for his
bonds then, that he was to accept the bid which we had
agreed upon that was to be made by the other broker;
in other words he was to offer them for the amount
of the debt if he could get it, if not, then he was to
sell them at the price fixed upon." Mr. Spencer re-
membered "the price fixed upon" as being twenty or
thirty dollars per bond. It is not disputed that it was
twenty dollars, and $1800, their proceeds at that price,
is the amount credited on the notes.

Mr. Lange, the broker who was instructed by Mr.

Spencer to sell the bonds on the floor of the New Or-
leans Stock Exchange said: "Mr. Spencer instructed
me to employ a broker. To sell to the highest bidder.
I employed a broker, Mr. W. A. Mysing. Mr. Mysing
was the only bidder. They were knocked down to him
by me. . . . The sale was in accordance with the
rules and customs of the New Orleans Stock Exchange.
. . . I knew nothing about the value, Mr. Spencer
never mentioned the value of the bonds; I have no idea,
even now, as to the value of the bonds. . . . He told
me they were bonds to secure a loan." This witness
further stated that he had no idea of the value of the
bonds and that he undertook to give no information;
that the bonds were not listed but were simply recalled
in accordance with the rule of the exchange in such
cases.

Sometime in the latter part of the winter of 1904
a syndicate was organized consisting of the plaintiff,
Mr. W. B. Rogers, John S. Rainey and Fenner, Hen-
derson & Fenner, a firm of lawyers, who purchased
the bank's interest in the notes and bonds at a price
equal to the amount of the notes with interest and ex-
penses incurred in the tranaction less the $1800 credi-
ted on account of the stock exchange sale. Mr. Dibert
had at the time no interest in the bank except as a
small stockholder. Mr. Rainey had no interest in or
connection with it whatever. Mr. Rogers as already
stated was its president and Mr. Henderson, one of
the law firm, was a director. Each of these parties,
considering the law firm as a single member, held a one-
fourth interest in the syndicate, and each put up his
share of the money to the credit of Mr. Dibert, who
paid the bank with his check on this fund.

Mr. John A. Lewis was cashier of the National
Bank of Commerce of St. Louis, which held thirty-
seven of the bonds of the Hardwood Export Company,
when the syndicate, through Mr. Dibert, entered into
the agreement with them hereinbefore set out. Dur-

ing his testimony Mr. Henderson's attention was called to the fact that both in the testimony of Mr. Lewis before the register of the chancery court in Alabama, and in the finding of the register, and also in the agreement between Dibert and Lewis, it was stated that these bonds were held by Fritsche as trustee for the Lumber Company. Mr. Henderson had already testified that Mr. Lewis represented to him that his bank was interested in the thirty-seven bonds and that his interest was figured on that basis; that Mr. Lewis had said that he did not care for the bank to figure in the matter, and preferred to have it in his own name; and that he, witness, also understood that the bank either owned or controlled the thirty-seven bonds. On being reminded by his attorney as above stated, Mr. Henderson said: "That recalls to my mind the ownership of those thirty-seven bonds and particularly so. We were advised reliably, and an examination of the minutes of the F. H. Smith Lumber Company—of the Hardwood Export Company and the F. H. Smith Lumber Company, impressed us with the fact that these bonds had never been regularly issued or disposed of by the Hardwood Export Company." He then repeated the statement that his recollection still continued to be at the time of giving his testimony, that "Fritsche's name was put in there simply as a substituted party, that John A. Lewis, representing the National Bank of Commerce, was the real party." The fact is that none of these bonds, so far as appears from any inference arising out of this evidence, had ever been issued or disposed of otherwise than as collateral.

Mr. Dibert testified as to his own connection with the syndicate: "I took an interest in buying the bonds simply from the representations that I had of the timber that backed these bonds. I thought they were worth buying."

248 Mo.—41

The property covered by the mortgage consisted of 28,282 acres of timber. The title to perhaps five thousand acres included the fee of the land, the remainder only the timber, with the right•to remove it up to a stipulated time varying from 1908 to 1915. Also mill property and equipment, logs, lumber, and logging equipment, including railroad material, engine and cars, all of which was shown by the evidence to have been worth as much as one hundred thousand dollars at the time of the sale of the bonds at the New Orleans Stock Exchange, and some of the evidence placed it very much higher. The climate where the mills were situated was very humid and such property deteriorated very rapidly when out of use. If necessary further reference will be made to the facts in the opinion.

The judgment of the trial court was for $42,030. 71, which practically represents, and was intended to represent, the amount of the notes and interest less the credit arising from the foreclosure sale, to be allowed and paid as other unsecured claims out of the assigned estate of the F. H. Smith Lumber Company. The counterclaim was dismissed.

I. Although the respondent has not appealed from that feature of the decree which holds the sale at the New Orleans Stock Exchange of the ninety bonds which constitute the kernel of this controversy, to be inoperative to change the character of the holding, it is still necessary to a correct understanding of the present status to consider it in the light of its effect, if it had any effect, upon the situation of the parties with reference to these securities. They have not come to our assistance with that free disclosure of the ultimate facts desirable in aid of such an investigation, but we shall assume, for reasons to be more fully stated hereafter, that these bonds were unissued, otherwise than is implied by their de-

Pledge.

livery as collateral security upon the notes of the corporation.

Considering them in the light of a mere additional promise of the maker of the notes to pay money, they cannot, from the very nature of the transaction, be considered as collateral security for the debt, for this would lead to the absurd result that one might make his promissory note for one dollar with a collateral note for two dollars, so that if he should be unable or fail to pay, the sale of the collateral would have simply the effect to double the amount of his indebtedness, without affording any additional security for the debt other than a penalty for its non-payment.  Should he,

**Mortgage Lien.** however, secure the second note by mortgage upon property, a different proposition would be presented.  Under such circumstances the note and mortgage may be treated as collateral to the indebtedness so far as is necessary to give the creditor in the first note the benefit, with respect to his indebtedness, of the lien upon the mortgaged property nominally created as security for the collateral note.  [In re Waddell-Entz Co., 67 Conn. 324, and cases cited; Easton v. Bank, 127 U. S. 532.] We do not wish to be understood as considering what rights an innocent purchaser for value might acquire by the purchase of negotiable securities placed in circulation through such a channel.  We only say that as between the pledgor and pledgee and those having notice of the character of the transaction, its only effect is to give the pledgee the benefit of the lien of the mortgage for the collection of his own debt.  The amount of the mortgage obligations that he may have as collateral, is only important in determining the extent to which his own debt may participate in the proceeds of the mortgage securities.

In this case the plaintiff contends that the pledgee of the mortgage bonds had the right as against the mortgagor, by virtue of the provisions of the contract

pledging them, to put them in general circulation so that they would become absolute obligations to the extent of their face value without any further consideration to the issuing corporation than the amount they might bring at a sale on the New Orleans Stock Exchange. Waiving for that purpose the question of the right of the issuing corporation to so contract as to issue its interest bearing bonds for ninety thousand dollars for a consideration of eighteen hundred dollars, so that in this case the interest contracted for would be equal to two hundred and fifty per cent, per annum upon the debt, we will simply consider whether such a result has been attempted by the terms of the contract and the facts now before us. The president of the pledgee states in his evidence that it was written on the regular form of its collateral note. This was applicable alike to all sorts of property and property rights susceptible of being pledged. It includes a mule, a diamond, a corporate security, a personal note or a government bond, or whatever else may be the subject of the pledge and written into the form; and the provision authorizing a sale at a stock exchange, so far as indicated by the grammatical construction of the instrument, applies equally to all. Yet it would be absurd to say that it would be in accordance with terms of such a contract, were the mule the subject of the pledge, or the diamond, to sell it upon the stock exchange. This like every other contract must be construed with reference to its subject-matter, and in this case, as we shall see, where two constructions are equally available, that one ought not to be adopted which is the most favorable to the pledgee. The stock exchange is so much a part of the financial method of our time that we take judicial notice of its general nature. We know that in a particular sense it is an association of stock brokers and stock dealers contributing to a gen-

Contract of Pledge.

Judicial Notice of Stock Exchange.

eral fund on account of their membership, and having
the exclusive right to buy and sell on the floor of their
exchange. They give aid to their patrons by the
closest scrutiny of securities presented to be listed by
them for sale. The information so obtained is always
available, and prices are fixed by their transactions.
It is evident from the nature of the case that these
stock exchanges are the best and most favorable agen-
cies for the sale of their listed securities, and that the
calling of the list, with all that it implies, suggests the
fullest information available. While the exchanges
have what is sometimes called the unlisted depart-
ment, and permit the sale of securities which do not
meet the requirements of the stock list, even these are
supervised by their committees so that the greatest
measure of security consistent with the freedom of
legitimate trade attends their operations. Trade
which does not come up to the standard of commercial
legitimacy is driven to the curb for its transaction.
The stock exchange is a market for commercial securi-
ties, and it is certain as we have already said that it
is no place to deal in tangible personal property like
live stock and jewelry. It is also very doubtful whether
a general authority like the one we are considering
to sell on the stock exchange includes securities which
have never been issued in the ordinary sense, which
have no market value and in which the holders have
only a special and unmarketable interest inseparable
from the indebtedness which they secure. Even if
such a sale could be made on the floor of the exchange,
where the only public available as purchasers would
be the brokers who constitute the ownership, it would
involve all those elements of commercial negotiation
included in an honest attempt of the seller to procure
a purchaser at the best price obtainable. These meth-
ods in their usual application are known to all and it
is not pretended that any of them were present in this

case. Not even the nature of the securities, or the name or title of the seller was disclosed.

It is admitted that *selling* was not the object of the proceeding. The president of the bank who directed the transaction tells us that he simply referred the matter to its attorney "to take possession of the collateral;" and he explains that by taking possession of the collateral he means to get it outright as property rather than hold it as collateral of a corporation that was no longer good. This frank and full statement has two aspects. (1) A dishonest one implying that this trustee whose duty it was in his fiduciary capacity to so use the collateral as to get the very most out of it for the benefit of the pledgor as well as his bank, deliberately violated that trust and attempted to convert the trust fund to his own use or the use of his bank as the case may be without compensation or benefit to the ultimate owner; or (2) an honest one implying that mindful of his obligation he believed that he could pay more of the debt of his beneficiary and perhaps save something to it in addition, by the innocent and harmless fiction that the bank and whomsoever it might find necessary to constitute its successor or successors in the trust was the absolute owner of the security and all that it represented, and might deal with it, as the conditions should develop, without embarrassment by those legal forms and inquiries and details which were henceforth to control the affairs of the insolvent and helpless debtor. We prefer, as perhaps it is our duty to do, even in case of the most sacred trust, the innocent aspect. We cannot, therefore, treat the transactions as a mere inadvertence by which an intended sale for the benefit of the security failed of accomplishment, leaving the parties in the same condition that it found them, but must consider it as the deliberate act of the bank, without a sale, to place itself in a position from which it could handle the bonds to its own greater satisfaction.

This necessarily imposed duties appropriate to the new position so assumed, and it is with these duties exclusively that the court is called upon to deal.

II. Whenever a person comes into the possession and control of the property of another, or in which **Trusts.** another has an interest, he becomes, with reference to that interest, a trustee, and is charged by law as well as by good morals to exercise such control with due regard to the interests of the beneficiary. Sometimes the trust is implied by law, but oftener the relation arises out of contract between the parties themselves. The possession and control is thought to give the trustee such opportunities for oppression and wrong in the management of the property as calls for the closest scrutiny of his acts, and out of this arises one of the most important branches of equity jurisdiction. And where the trust is created and defined by contract the contract itself will be construed, in cases of doubt, favorably to the preservation of the interest of the beneficiary. [Hagan v. Bank, 182 Mo. 319; Laclede National Bank v. Richardson, 156 Mo. 279.]

That this relation, with its consequent duties, exists between the pledgor and pledgee of collateral **Pledgor and Pledgee.** securities follows from the nature of the transaction. It is a trust for the protection of the debt and the creditor holds the collateral as the trustee and agent of his debtor for that purpose. [Richardson v. Mann, 30 La. Ann. 1060, and authorities cited.] We refer to this case not only on account of its general value as authority and its numerous citations, but because it represents the views of the highest court of the jurisdiction in which this transaction arose. The same honest doctrine has also found frequent expression in this court. [Boardman v. Florez, 37 Mo. 559; Hagan v. Bank, supra; Laclede

National Bank v. Richardson, supra; Bank v. Kilpatric, 204 Mo. 131.]

The rule is that in dealing with the interest of his debtor in such securities the creditor is charged with the duties and subjected to the liabilities of agents in the transaction of the business of their principals. If their duties are defined by express contract, the terms of the contract answer all inquiry as to the nature and extent of the trust; but limitations in the contract upon the liability which the law itself would imply must be plainly expressed; and fraud cannot be authorized by contract, because the State will not lend its aid to the enforcement of any agreement in derogation of public morals or of the general policy of its laws. There is another rule of which we must not lose sight. It is stated by the respondent in his argument as follows: "The acts of the trustee must, however, be judged in each case by the facts and circumstances of that case." This is, perhaps, a better form to express the idea that before a rule of law can be applied there must be something to which to apply it; and that something constitutes the foundation of all judicial investigation. Having always in mind then the circumstances of this transaction, we are led to the consideration of the equities between the parties to this case.

When Mr. Rogers, the president of the bank, "took possession of the collateral" by putting it through the form of a sale on the floor of the New Orleans Stock Exchange for the avowed purpose of giving the bank a more perfect control, he was the trustee and agent for the pledgor. In that capacity he assumed a new standpoint of his own choosing from which to carry out the provisions of the trust. The conditions were further modified by the total insolvency of both the makers of the notes. Mr. Smith, the president of both corporations, indicates the character of the disaster in his statement that his entire personal estate, including the earnings of a lifetime,

had been swept away. This, of course, made it impossible for either or both to redeem the pledge. Nothing remained for the pledgee to do but to execute his trust; but to realize as much as he could from the pledged property; and, in the absence of special power to do otherwise, to proceed as a prudent owner would with his own (Bank v. Richardson, supra, 279, 284); for it would be a hard doctrine that enables a trustee to take advantage of the misfortune of his beneficiary to despoil him, in violation of the faith he had pledged in assuming the control of his property, and leave him without remedy because he is unable to pay his debt as a condition of having it honestly administered. The pride of our equity jurisprudence is in its administration of justice to all alike, whether rich or poor, thus placing its remedies within the reach of all. This court, in Hanson v. Neal, 215 Mo. 256, 273, said: "That he who seeks equity must do equity as the price of his decree is a cardinal maxim steadily applied except when its application furnishes protection to wrong and fraud, as, for example, in Axman v. Smith, 156 Mo. 286." In the case so cited (156 Mo. l. c. 294) Judge VALLIANT, speaking for this court, said:

"If in a case where the plaintiff is unable to redeem, he can have no standing in a court of equity, then, in such case, the trustee may boldly violate his duty, perpetrate a fraud and when called to account take cover under the maxim, 'He who seeks equity must do equity.' That maxim was never intended to furnish protection to wrong and fraud. The petition in this case shows that the property is encumbered with a second deed of trust, an attachment, and judgments aggregating an amount greatly beyond its value and that the plaintiffs are insolvent and therefore unable to redeem. But those facts do not absolve the trustee from his duty, nor destroy the plaintiff's rights to have the property sold to the best advantage according to the terms of the deed of trust, to the end

that it will go as far as may be towards the payment of their debts. That is a right they have for their own interest and a duty they owe to their creditors.''

Another circumstance to be considered is the nature of the property involved in the mortgage. Of the twenty-eight thousand acres of timber, all except about five thousand acres in which the mortgagor owned the fee, consisted of timber growing upon lands of others with the right to remove it at various times extending from 1908 to 1915, which was necessarily becoming less valuable on account of these limitations. The mill properties and their equipment were peculiarly subject to deterioration in that climate when not in use. It is also a matter of common knowledge that the care and preservation of the timber from trespass and theft is a matter of expense, and through it all the item of interest is continually accumulating, so that the situation calls for prompt as well as skillful handling.

In the meantime whatever thought there may have been in the mind of Mr. Rogers and his associates in the bank at the time of the stock exchange sale of using the advantage they acquired by that transaction for the benefit of the security for the payment of the notes, seems to have been swallowed up by the speculative spirit. A syndicate was formed, the personnel of which is of interest, to purchase the collateral, together with the notes in this suit, and to use the bonds in the acquisition of the mortgaged property. The sale of the collateral at the Stock Exchange took place January 21, 1904; on February 23, 1904, the syndicate paid the amount of the notes and interest to the bank, which indorsed them without recourse and assigned the bonds to the plaintiff Dibert as trustee for its members. At this time and at all times thereafter, up to the final argument in this case, the syndicate, represented by Dibert, has claimed that the absolute title to the bonds, discharged of any interest of the pledgor,

passed to the bank by the stock exchange sale; and that by the indorsement and assignment to Dibert he took in trust for himself and his associates in the syndicate a similar absolute title which he still holds. On January 1, 1904, the bank was discredited in the city, and during the time of these transactions was engaged in "cleaning up," and the Hardwood Company paper was counted among its inactive or dead assets. The members of the syndicate were Mr. Rogers, one-fourth, Mr. Rainey, who had no interest whatever in the bank one-fourth, Mr. Dibert, who acted throughout and still acts as trustee for his associates and was a small stockholder in the bank, one-fourth, and the law firm of Fenner, Henderson & Fenner one-fourth. Mr. Henderson was a director of the bank at the time of this purchase but the interest of the firm does not otherwise appear. Mr. Dibert says frankly that he took an interest in the purchase of the bonds simply because he thought from the representations he had of the timber that backed them they were worth buying. Mr. Rainey's action in the purchase needs no other explanation than that he had no connection whatever with the bank. The financial interest of Mr. Henderson in the bank does not appear. It is agreed by all that the purchase from the bank was absolute, leaving no liability with reference to the notes, or interest in the bonds. With the exception of the statement of Mr. Dibert there is no direct evidence as to how far the notes were taken into consideration in the transaction. There is no doubt, however, that they were considered important as an element in the transfer of the collateral, which would ordinarily follow as an incident to the ownership of the principal debt.

The assignment of the notes and bonds to the syndicate placed it squarely in the shoes of the bank with respect to the entire transaction. It not only became the owner of the debt, but the trustee and agent of the pledgor with respect to the collaterals. What-

ever may have been the diversity of opinion among the courts of other jurisdictions, its duties arising out of that relation have been fully considered and are well defined in the jurisprudence of this State. The pledgor parts with his control of the collaterals, and in receiving such control the pledgee assumes to exercise it with due regard to their preservation and appropriation in the interest of the pledgor as well as his own. As is said in Brandt on Suretyship (1 Ed.), sec. 384, and quoted with approval by this court in Bank v. Kilpatric, supra, "The necessary care and attention should be bestowed to preserve the value of whatever is thus voluntarily, and with a view to one's own interest, taken under his control." If the pledgee sell it, in the absence of special power to do otherwise he must proceed as a prudent owner would do with his own (Bank v. Richardson, supra, l. c. 279), and it is incumbent on him to obtain the best possible price and use every reasonable means to obtain the full value of the pledged property (Id., 284). The subsequent proceedings of the syndicate, as we have already stated, were conducted exclusively in their own interest and under the claim that the results of their operations inured to their own exclusive benefit. They not only denied the interest of the pledgor but used the situation which had been brought about by the stock exchange sale to make its exclusion from any participation in the collateral easier and more absolute. They have now reached the point where, to make its conversion complete, they ask the court to give vitality to the farce by its judgment that although the attempted sale was void, it cuts off the right of the debtor to have the collateral applied in payment of the debt as far as it will go. In other words, it may be sacrificed with impunity unless the debt is fully paid.

For the purpose of acquiring an available title to the lands which were the real subject of the pledge, it was necessary that the mortgage be foreclosed and its

lien enforced. The same reasons that made this course advisable in the interest of the syndicate impressed it as a duty in the interest of the pledgor, so that when Dibert, their trustee, caused suit to be brought for that purpose in the Alabama court he did it in a capacity and subject to duties and responsibilities which were characterized by this court in Boardman v. Florez, as follows: "The appellant, when he proceeded to collect the note, and, in furtherance of that purpose, caused the land to be sold at trustee's sale, placed himself in the attitude of an agent or attorney for collection, and was subject to all the rights and disabilities incident to that character. He stood on the footing of a trustee, bound faithfully to carry out the objects of the trust, and could not, under any circumstances, speculate for his own private gain, to the prejudice of his principal. No rule is better established than that an agent or trustee will not be allowed, while transacting the business of his principal or *cestui que trust*, to derive a private benefit, to the injury of the person for whom he acts." See also Hanson v. Neal, 215 Mo. 256; Goode v. Comfort, 39 Mo. l. c. 325; Hagan v. Bank, supra, l. c. 343.

The bank had neglected to provide in its usual form of collateral note any way by which it was relieved from the responsibility imposed by law with reference to this proceeding. There was no authority given it by the contract to purchase at a foreclosure sale. Dibert as trustee had taken its place and assumed the performance of all its duties and liabilities which will have to be judged by the standards of the unwritten law in force in this State, for no other rule of the *loci contractus* has been pleaded or proven. It is suggested in the respondent's brief that the ordinary rules which apply between pledgor and pledgee are not applicable in this case because the collateral in question here is not the note of a third party, but the obligation of the debtor itself; so that the same

rule should apply in case of foreclosure that would be applicable had the mortgage been given to secure the principal debt. We have already stated that in so far as these bonds constitute a personal liability of the Hardwood Export Company they have no force whatever otherwise than as an evidence of the pledge of an interest in the lands mortgaged to secure them. The pledgee becomes the holder of them for the purpose of enforcing his lien by the foreclosure of the mortgage. This lien constitutes the pledge and is collateral to the principal debt in the same sense as if it were a horse or the note of a third party or any other article of personal property. The duties of the pledgee arise from the fact that he has taken it into his possession and control to the exclusion of the true owner until its office shall be accomplished. The fact that it can only be foreclosed by action against the debtor is not material. Before the amendment of 1872 to article 3165 of the Civil Code of Louisiana it was necessary to foreclose every pledge by judicial proceeding but it has never been asserted that the character of the trust under which it was held was changed or modified by that statute. We look then at the proceedings subsequent to the purchase by the plaintiff for his syndicate from the standpoint that in that transaction he became the pledgee of the property and assumed the duty to use very reasonable means to make it yield the largest amount practicable toward the payment of the debt and to produce a surplus for the pledgor. The measure of this duty is held, in this State, to be what a prudent man would do with his own, and this is so reasonable and just that we have no inclination to disturb the rule. In his capacity as agent and trustee he was subject to the disability that he could not speculate for his own benefit with the subject of his trust. Under these circumstances he instituted a proceeding in the Alabama Chancery Court by exercising the right given by the mortgage

to request the trustees to foreclose. This was prosecuted to an interlocutory decree for the sale of the lands. Up to that time we are without information that the plaintiff knew that any one else was interested in the foreclosure, but it then developed that the National Bank of Commerce of St. Louis held in some capacity thirty-seven of these bonds and was represented in the matter by Mr. John A. Lewis, its cashier. Ordinarily such an important interest would give great encouragement to a mortgagor in an attempt to make the property bring a substantial price, by putting a prospective bidder in the field, but care was taken in this case to place a prudent limit upon such an effect, by making the two parties interested a single bidder. The plaintiff made a contract with Lewis by which he, plaintiff, agreed to bid at the foreclosure sale such sum as might be necessary to buy the property, not to exceed $75,000, on the joint account, in the proportion of thirty-seven shares to Lewis and ninety to Dibert. The contract also provided that Dibert might bid more than $75,000, but in that event his purchase should be for his own account and not for the joint account of the parties. The result was that at the sale Dibert, as trustee for his syndicate and agent of Lewis under the contract, bid $25,000 and the property was awarded to him at that price. He paid for the interest of himself and associates in the syndicate with the ninety bonds that represented his trust fund and claims in his reply to have paid in addition thereto about $3800 in cash upon the entire purchase including the interest represented by Lewis. Reduced to its lowest terms, Dibert, after having contracted in writing to pay about $54,000 for the interest represented by his ninety bonds, bought the same interest for $18,000 and paid practically all of the purchase price out of his trust fund. The Lewis contract is an important element in determining, as against Dibert, the value of the mortgaged property at the time of the

Alabama sale. The transaction was an important one, and called for serious inquiry and consideration on the part of those engaged in it. One's opinion gets weight from the fact that he is willing to depend upon it himself, and in determining the value of this property as against the parties to that contract the deliberate declaration which it contains is entitled to consideration. Judged by this standard the plaintiff purchased the property at the foreclosure sale at one-third its actual value.

In converting the property into money he was the agent of the owners, and precluded from speculating for his own profit and that of his associates. He could not at will cast off the burden of his trust and place it upon the shoulders of his insolvent beneficiary whose hands he had tied by creating a situation in which he could claim with all the color of truth that the beneficiary had no interest in the matter which its friends could serve it by protecting. He must stand to the duty he had voluntarily assumed in furtherance of his own interest, by treating the interest of his pledgor as a prudent man would treat his own, so as to make it bring the best price obtainable. He held the measure of his duty in his hand at the time. As a presumably prudent man he was dealing with his own interest in the same transaction. Their interest in making the property bring enough to pay the debt and costs and expenses coincided with his own, yet to protect himself he was willing to pay seventy-five thousand dollars, while he now contends that one-third that amount was ample for the protection of his principal. We do not see anything in the nature of this transaction to relieve him from his duty as agent to account for its profits to his principal. We are warranted in taking, and equity requires that we should take, the amount which the plaintiff had agreed to bid if necessary, as the fair value of the property at the time he acquired it at that sale. If he desired to and

did appropriate the property at that sale discharged
of the trust, and relieved himself of all obligation
to his principal, without its express and voluntary as-
sent, he must under the circumstances of this case, do
so upon condition that he account for the price which
he himself fixed as his own maximum bid before the
sale. He insists in his pleading, however, that he should
not be so held because he did not elect unconditionally
to hold the land, but that at all times during the six-
teen months following the foreclosure sale, and ex-
tending up to the organization of and transfer to the
Mount Vernon Hardwood Company he had endeavored
to sell it for what it had cost in the purchase from the
bank, with interest and subsequent expenses, and at
that time one of his co-owners had made that offer to
one of defendant's counsel at that price. That these
efforts having proved unavailing the new corporation
was formed for the purpose of operating the property
which was transferred to it for stock of the par value
of one hundred thousand dollars. The offer to sell
was not kept good in the pleadings, either directly or
through an offer to transfer the new stock.

It will be seen from the foregoing statement that
the plaintiff, during the sixteen months which inter-
vened between the foreclosure sale and the time he
put it out of his power to recover the property by
transferring it to the new corporation, had steadily
held it at a price which would extinguish the entire
debt for which it had been pledged. He used the posi-
tion in which he had been intrenched by his fiduciary
relation as holder of the collaterals, as an instrument
of pressure upon the insolvent debtor to pay the en-
tire debt with its costs and expenses which he knew it
could not do, or to forego any further participation
in their proceeds. This, we have already said, he
cannot do.

The plaintiff has earnestly directed our attention

to Easton v. Bank, 127 U. S. 532, in which the highest court in our nation sustained a sale in which the pledgee of unissued bonds became the purchaser, jointly with others interested, at a trustee's sale made upon the application of holders of other bonds secured by the same mortgage. In that case there had been no attempt to sell the bonds by authority of the pledge. The sale was a fair one, accompanied by no circumstance of undue advantage or oppression, and its proceeds were immediately credited upon the notes. While the court said that this sale carried with it the entire interest of the pledgor so that he was not entitled to recover in an action brought for a surplus which resulted from a sale by the pledgee four years afterward, it was also held that the plaintiff in that case who sued as assignee of the pledgor, had shown no title by virtue of his assignment to any claim which the pledgor might have for relief. While that case does not reach the real grounds of complaint made in this, we do not wish to be understood as approving the general doctrine there expressed. It has, as we have shown, been disregarded by this court, which has always stood for the equitable principle announced by the Supreme Court of the United States in Michoud v. Girod, 4 How. 503, and expressly approved in the following terse comprehensive quotation: "The wise policy of the law has heretofore put the sting of disability into the temptation, as a defensive weapon against the strength of the danger which lies in the situation." [Boardman v. Florez, supra, quoting Davoue v. Fanning, 2 Johns. Ch. 270.] The difference between the Easton case and the one at bar is that in the former, the trustee only subjected himself to the temptation; while in this he not only met it half way but yielded to it; and has only been constrained to credit his beneficiary with the purchase price when compelled by the stress of this litigation. That he

Dibert v. D'Arcy.

does so now is an answer to any suggestion that the defendant has not been prompt in complaining.

III. But respondent insists that the defendant, representing the Smith Lumber Company as the assignee of *all* its property for the benefit of its creditors, has no interest in this collateral because (1) the bonds did not pass to it from the Hardwood Export Company by reason of the facts stipulated in this case, and (2) because the transaction was one between the company last named and the bank, with which the Lumber Company had no concern. This makes it necessary to determine the relation between these three parties as shown by the record. It was stipulated that six months prior to October 16, 1903, the Lumber Company acquired all the property and property rights of the Hardwood Export Company of every kind and description wheresoever located, and continued to own such property up to the time of the assignment, by which it passed to the assignees of the Lumber Company. The appellant is right in his position that these transfers did not include the bonds. Considering these as unissued obligations of the maker they were not property except in the sense of the material of which they were composed which is not the sense in which we are dealing with them in this case. Considering them as issued, the result is the same; for debts are far from being the "property" of the debtor. They were, however, unissued, and, as we have already shown, their delivery as collateral security was the creation of a lien upon the property entirely collateral to the principal indebtedness, for the purpose of securing it. Expressing the idea in other language—the property was pledged to secure the debt. At and before the time of the making of the notes now in suit, the property of the Lumber Company stood pledged to pay the notes of the Hardwood Export

*Bonds as Property.*

*Suretyship.*

Company alone. The former company, to the extent of this collateral, was prima -facie the surety of the latter. A surety is simply one who is bound for a debt of another. "It is immaterial," said Judge COOLEY, in Smith v. Shelden, 35 Mich. 42; 47, "in what form the relation of principal and surety is established, or whether the creditor is or is not contracted with in the two capacities, as is often the case when notes are given or bonds taken; the relation is fixed by the arrangement and equities between the debtors or obligors, and may be known to the creditor or wholly unknown. If it is unknown to him, his rights are in no manner affected by it; but if he knows that one party is surety merely, it is only just to require of him that in any subsequent action he may take regarding the debt, he shall not lose sight of the surety's equities." These same notes constituted the consideration for the renewals now in suit. At the time of the renewal Mr. Rogers, the president of the bank, had ascertained that the Lumber Company had "taken in" the Hardwood Export Company, and he secured the "indorsement" of the Lumber Company on all of them and of Mr. Wernicke on the largest one as conditions of renewal. As to the relations between the two corporations who were makers of the paper there is no hint of a change. But whatever may have been the contract relations or equities between the debtors, the *property* of the Lumber Company was pledged as a collateral security for the payment of the debt, and the Lumber Company has the right to see that it is properly applied according to the terms of the pledge. as it is seeking to do in this proceeding.

IV. It is insisted by the respondent that the appellant is estopped from asserting that the title, or any part of the title acquired by the plaintiff either through the New Orleans Stock Exchange sale or under the foreclosure sale in Alabama is burdened with a trust in favor of the Lumber Com-

Estoppel.

pany, (1) by the final decree in the foreclosure suit; (2) by the fact that Fritsche while trustee of the assigned estate of the Lumber Company received the proceeds of the thirty-seven bonds held by Lewis, which measures the interest he now has in the property purchased by plaintiff.

As to the first of these contentions it is only necessary to call attention to the fact that the Lumber Company was not a party to that suit, while the record shows that Fritsche, through whom it is attempted to bind it, together with his co-assignee McKinnon, was a party in his capacity as assignee for the assigned estate of the Hardwood Export Company only. As is said by Mr. Black in his admirable work on Judgments (2 Ed., sec. 536): "It is not only necessary that the party sought to be bound by the former judgment should have been a party to both actions, but he must have appeared in both in the same capacity or character." "This rule," says the author, "is one of the fundamentals of the jurisprudence of the subject." The second contention is answered by the statement that we do not understand the validity of the mortgage sale to be in question in this proceeding. Nor are the thirty-seven bonds, or their proceeds, or the fairness or good faith of anything connected with them. The only issue involved in this suit is whether or not the circumstances relating to the ninety bonds pledged to secure the notes of the Hardwood Export Company and the Smith Lumber Company are such as to render the plaintiff a trustee for the Lumber Company with reference to such interest in the mortgaged land as was acquired by the plaintiff on account of its relation to those particular bonds. Nor is either of these defenses pleaded; and it is well settled in this State that neither defense can be made available in a suit of this character otherwise than by pleading.

*Former Judgment.*

V.  As to the counterclaim of the defendant in which he asks a judgment over against the plaintiff for the difference between the amount of his note and the sum of $100,000, which the plaintiff received in stock of the Mount Vernon Company at par on its organization, we cannot fully appreciate the argument by which the defendant has sought to sustain it.  It is based upon the theory, to which we fully subscribe, that under the admitted circumstances of this case the plaintiff was not in a position to profit by the Alabama purchase, but its weakness lies in the manner in which he attempts to sustain that position.  While there is substantial evidence as to the value of the property in December, 1903, and the beginning of 1904, the defendant has preferred by his answer to base his right to recover upon the par value of the stock issued on account of this property on the 26th day of March, 1906, without proof of its actual value at that time other than that we have already noticed, indefinite statements relating to negotiations for the sale.  We have already intimated that the nature of the property was such that there could be no presumption that its value would continue through any considerable period. The principal purpose of the organization of the Mount Vernon Company seems to have been to provide a fund consisting of capital stock for the development and operation of the property upon a paying basis.

*Trustee's Method of Valuing Property.*

The issue of stock to the owners made no change in their relative interests, and as a declaration of value was not of such character that justice would be promoted by compelling plaintiff to respond in money when he received no money or other consideration independent of the property itself.

For the reasons given the judgment of the St. Louis Circuit Court is in all things reversed and the cause remanded to that court with directions to dis-

solve the injunction and dismiss the plaintiff's petition at his costs.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All the judges concur, *Woodson, P. J.,* in result.