## PHILIP GILBERT v. FOSSTON MANUFACTURING COMPANY AND OTHERS.[1]

No. 26,153.

December 9, 1927.

**Notes governed by law of Illinois.**

1. Negotiations carried on by personal conference in St. Paul and Chicago and also by correspondence between the two cities resulted in the signing of notes by the makers and guarantors in St. Paul and their delivery to the payees in Chicago. The notes were payable in the latter city. They must therefore be governed with respect to interest and usury by the laws of Illinois.

**Presumption that parties contracted with intention contract should be enforceable.**

2. It is immaterial that the parties themselves had neither thought nor actual intent as to the law of what state should govern the transaction, for if in such case the contract would be a nullity in Minnesota but valid and enforceable according to its express purpose in Illinois, it must be presumed that the parties contracted with reference to the law of the state where their contract would be enforceable according to its terms.

**Illinois statutes respecting foreign corporations construed.**

3. The statutes of Illinois concerning foreign corporations and their doing business in that state construed not to refer to corporations not domesticated and not transacting intrastate business in Illinois. The statute does not affect a corporation carrying on interstate commerce or engaged in single or isolated transactions in the state.

AFTER REARGUMENT.

March 9, 1928.

**Application of bonus forfeited for usury.**

4. A bonus, retained from a loan and which is forfeited for usury, goes in reduction of the loan as made and not in payment of it after-

[1]Reported in 216 N. W. 778, 218 N. W. 451.

wards. Not being a payment, the borrower has nothing to say as to its application. The bonus cannot subsequently be applied arbitrarily merely to avoid a default which existed when collateral was sold and which under the controlling contract justified that sale.

**Illinois law as to sale of bonds pledged as collateral.**

5. Under the controlling law of Illinois, corporate bonds may be pledged to secure the indebtedness of the maker; and, the contract of pledge so providing, they may be sold by the pledgee and enforced by the purchaser for their full amount.

Bills and Notes, 8 C. J. p. 92 n. 63.
Contracts, 13 C. J. p. 248 n. 16.
Corporations, 14a C. J. p. 632 n. 67; p. 1253 n. 48; p. 1273 n. 5.
Usury, 39 Cyc. p. 897 n. 64; p. 899 n. 69, 72; p. 902 n. 78; p. 913 n. 30; p. 1026 n. 76.

See note in 62 L. R. A. 44; 27 R. C. L. 255.

L. K. Baker as holder of bonds of the defendant Fosston Manufacturing Company appealed from a foreclosure judgment of the district court for Ramsey county, Hanft, J. denying his claim on the ground of usury. Reversed in part.

*Snyder, Gale & Richards* and *Barthell & Rundall,* for appellant.

*Lew C. Church* and *Arthur Christofferson,* for respondents Fosston Manufacturing Company and John A. Wright, its receiver.

STONE, J.

Action for the foreclosure of a trust deed securing $150,000 in bonds of Fosston Manufacturing Company, a Minnesota corporation, in which, under order of court, the holders of the bonds appeared as claimants. L. K. Baker, the holder of $75,000 of the bonds, appeals from a judgment denying his claim in toto on the ground of usury.

The trust deed became effective in February, 1923, and $75,000 of the bonds was soon negotiated. Of that amount, $65,000 is still outstanding. The other $75,000 of the issue was held for a short time by the corporation and finally used in a manner now to be explained. In March, 1923, the company was hard pressed for funds

and negotiated a $30,000 loan from S. M. Bloss (doing business as S. M. Bloss & Company) of Chicago. After the principal of that loan had been reduced by payments to $21,000, the company, again in urgent need of cash, negotiated another loan of $14,000 from Bloss, consummated in January, 1924. As security for each loan the company pledged the remaining $75,000 of its bonds. Although Bloss & Company, on the face of the transactions, was nominally a mere broker, taking the notes for negotiation to others, it was in fact the lender. Bloss intentionally exacted and the borrower agreed to pay, in addition to annual interest at seven per cent, a bonus, in the form of commission, which made the return to the lender in excess of 20 per cent in each case.

There was a formal application for each loan. They were merged in the notes and so may be ignored except as part of the negotiations, which were conducted in part through correspondence between St. Paul and Chicago but very largely by personal conference at Chicago. The notes were payable there. After the making of the second loan a default occurred and Bloss & Company foreclosed on the bonds. They were sold, nominally at public auction, in a manner which as to procedure conformed with Illinois law. At the sale Bloss and Baker were the only bidders, and the bonds were sold to the latter for $26,000. Baker is found to have been acting wholly for Bloss.

It was held below that the notes were Minnesota contracts, void under the usury laws of this state (G. S. 1923, § 7038), and that Baker, not being a holder in due course, had acquired no title to the bonds. By reference thereto, the bonds subjected themselves to all the terms of the trust deed securing them. They were thereby rendered non-negotiable under the rule of King Cattle Co. v. Joseph, 165 Minn. 28, 205 N. W. 639. Our attention has been invited to no law of Illinois which would make them negotiable, and such a law, if any, could not affect the result as Baker is not a holder in due course.

The argument for appellant Baker is that the notes to Bloss & Company were Illinois contracts and not usurious under the laws of that state. If that be so, the pledge of the bonds is also unob-

jectionable and Bloss, having the right under the pledge contracts to purchase the bonds himself, the title of his representative, Baker, is good.

1. Notwithstanding a finding that the notes were Minnesota contracts, we are constrained to hold that plain facts make the question one of law which must be resolved for appellant. The $30,000 note was signed by makers and guarantors in St. Paul and mailed to Bloss & Company at Chicago. The $14,000 note was likewise executed in St. Paul but sent to Bloss & Company at Chicago by an agent of theirs. It was the plain intention that the notes should not be effective until received by Bloss & Company at Chicago. Checks for the proceeds were not forthcoming and not expected to be until actual receipt of the notes by the lender at Chicago. Both notes were payable at the office of Bloss & Company at Chicago. Illinois was thereby fixed as the place of both contract and performance and its law must control. Green v. N. W. Trust Co. 128 Minn. 30, 150 N. W. 229, L. R. A. 1916D, 739; Mueller v. Ober, 172 Minn. 349, 215 N. W. 781.

The general rule is that contracts, not relating to real estate or specific personal property, are governed as to effect and performance by the law of the place where they were made. They are not considered made until the last act necessary to give them effect has taken place. McKibbin v. Ellingson, 58 Minn. 205, 59 N. W. 1003, 49 A. S. R. 499. The place where that act takes place therefore becomes, no more appearing, the place where the contract is made. The only alternative is to treat the notes as having been made in St. Paul but to be performed in Illinois. That view would bring us to the same end, for it would invoke the "general principle * * * well settled" that such contracts "are to be governed by the law of the place of performance." Seeman v. Philadelphia Warehouse Co. 274 U. S. 403, 407, 47 S. Ct. 626, 71 L. ed. 672. Ames v. Benjamin, 74 Minn. 335, 77 N. W. 230. In the Seeman case it is observed accurately (quoting Wharton) that where the bona fide intent of the parties was to fix the situs of the transaction at a "place which has a natural and vital connection" with it, an intention to obtain the highest possible legal interest "does not prevent the application

of the law allowing the higher rate." In other words, "greed for interest" to that extent is immaterial.

2. Here we note a finding that there "was neither thought, nor actual intent" in the minds of any of the parties "as to the law of what state should govern the transaction." That is normally the case, but notwithstanding the contract must be given a situs when there arises concerning it a problem of conflict of laws. The method of the law with respect to all writings the authors of which have intended a legal effect is to achieve if possible the intended result. It offends both sense and justice to prevent obligation where obligation is clearly intended. So if a contract may be placed either in state A or state B, the parties themselves not having indicated or even considered by what law it should be governed, and it is a nullity under the laws of state A but valid and enforceable according to its expressed purpose in state B, the law refers it to that state. In no other way can the plain intent to assume contractual obligation be given effect. So if the method is a species of "legal jugglery" (Green v. N. W. Trust Co. 128 Minn. 30, 150 N. W. 229, L. R. A. 1916D, 739), it is after all an open and honest kind of legerdemain done in full view of the audience. If it be a mere trick of the law, it is at least in the interest of honesty, especially so where it prevents a forfeiture as it does here. It is "in support of a policy of upholding contractual obligations assumed in good faith." Seeman v. Philadelphia Warehouse Co. 274 U. S. 403, 407, 47 S. Ct. 626, 71 L. ed. 672. Only by considering the notes Illinois contracts can we escape putting the borrowers in the moral category of swindlers. We are simply declining to hold them guilty of procuring money by the false pretense of a contract to repay and a sham pledge of security. (Our statute not only voids usurious notes but also forfeits the debt.)

Both notes were payable at the lender's office in Chicago, with the right in the holder "from time to time" to appoint another place of payment. The mere right of the holder from time to time to change the place of payment probably could not render the contract ambulatory so as to be tested now by the laws of one state and then by those of another. The situs of the contract, as distinguished from

the changing place of part performance, would not change. But here the right to change the place of performance was not exercised. We need go no further.

3. We next consider the applicable laws of Illinois, pleaded and proved as facts. The statute concerning interest and usury is Smith-Hurd, Ill. Rev. St. 1923, c. 74. Sections 4 and 5 prohibit any "person or corporation" from taking, directly or indirectly, interest at a greater rate than seven per centum per annum. Section 6 penalizes "any person or corporation in this state" who "shall contract to receive a greater rate of interest or discount" by a forfeiture of "the whole of said interest so contracted to be received." Section 11, providing that "no corporation shall hereafter interpose the defense of usury in any action," has been construed by the supreme court of Illinois in Union Nat. Bank v. Louisville, N. A. & C. Ry. Co. 145 Ill. 208, 34 N. E. 135, and Dorothy v. Commonwealth Co. 278 Ill. 629, 116 N. E. 143, L. R. A. 1917E, 1110. The holding in both cases, as stated in the latter, is "that while a corporation cannot, on account of said section 11, insist upon the forfeiture of all interest, as provided by section 6 of the interest act, where the debtor has contracted to pay usurious interest, yet said section 11 does not prevent the debtor corporation from insisting that only interest at the legal rate shall be allowed in determining the amount due the creditor."

If we could stop here it would be clear that the amount due on the notes to Bloss & Company at any time could be correctly ascertained only by charging interest at the Illinois maximum of seven per centum. But there is in evidence another statute which demands consideration. It is "the general corporation act" of Illinois, approved June 28, 1919 (Laws of Ill. 1919, p. 312 et seq.). Each *domestic* corporation subject thereto is given the power among other things (§ 6, subd. 7) "to borrow money * * * without regard to or restrictions under any usury law of this State." Sections 80 to 95, inclusive, have to do with foreign corporations and their domestication in Illinois.

Section 95 of the statute reads:

"Foreign corporations *entitled to transact business in this State at the time this Act takes effect* * * * shall be entitled to all the rights and privileges and shall be subject to all the limitations, restrictions, liabilities and duties as are prescribed herein for foreign corporations *admitted to transact business in this State under this Act."* (Italics ours.)

Unless that language applies to the Fosston company, which was never admitted to do business in Illinois, the loans now in question having been isolated and single interstate transactions, its receiver in this proceeding is entitled to the benefit of the interest statutes already discussed, which limit interest to seven per centum. We are thus at the final and crucial question.

We must interpret the statute of another state, and we proceed with embarrassment because, counsel assure us, there is no construction by the supreme or any other court of Illinois. It appears to us that § 95 lends itself to clear and inescapable interpretation without resort to extraneous aid, but in view of the argument contra we have considered the section even from the external viewpoints. As already indicated, § 95 is a subdivision of a general corporation statute dealing with the domestication of foreign corporations. It is an untenable suggestion that the legislature of that state would attempt to impose its conditions upon a foreign corporation transacting only interstate business in Illinois, for such an attempt would be beyond its power under the commerce clause of the federal constitution. Crutcher v. Kentucky, 141 U. S. 47, 11 S. Ct. 851, 35 L. ed. 649; International Textbook Co. v. Pigg, 217 U. S. 91, 30 S. Ct. 481, 54 L. ed. 678, 27 L.R.A.(N.S.) 493, 18 Ann. Cas. 1103. That is nowhere more clearly recognized than in Illinois. Lehigh Portland Cement Co. v. McLean, 245 Ill. 326, 92 N. E. 248, 137 A. S. R. 322. So that portion of the statute dealing with foreign corporations must be construed with that limitation in mind. "What is intended by the statute * * * was to guard against foreign corporations doing business in this state in competition with domestic corporations without being subject to the same restrictions and control as the domestic corporation, and to prevent what in effect would be,

but for the statute, unfair competition in domestic trade in giving advantages to the foreign corporation not possessed by the domestic." A. H. Woods Production Co. v. Chicago, C. & L. R. Co. 147 Ill. App. 568, 569. The purpose of § 95 is a common one in legislation, recurring in almost every revision of statutes on a subject such as that of corporations or occupations which can be carried on by individuals only under state authority. Always in such a case there are those who are lawfully admitted to do business or licensed at the time the new law takes effect, and always the purpose is to put them on a parity with those coming in under the new law. The latter portion of § 95 refers only to foreign corporations domesticated after the new law took effect, and the first part just as plainly to foreign corporations domesticated (under preceding statutes) before.

None of the companion provisions of § 95 suggests any thought that nondomesticated foreign corporations are at all affected by the act except as they may violate it by attempting domestic business without the admission requisite for that purpose. Throughout the sections relating to foreign corporations we find used as synonyms the phrases, "admitted to do business in this State" (§ 83) ; "foreign corporation admitted to do business" (§§ 84 and 85) ; "foreign corporation licensed to do business in this State" (§§ 87 and 88). Each of such phrases wherever used applies only to domesticated foreign corporations. It would be passing strange if we found a different meaning attending the phrase "entitled to transact business in this State" in § 95, particularly when again it is conjoined as an equivalent with "admitted to transact business in this State." There as elsewhere in the act the words "admitted" and "entitled," when used with respect to foreign corporations, are synonymous. Both words refer to the formal act of domestication or to a corporation which has by such act domesticated itself.

There is a "consensus of opinion that a corporation" in order to come within the purview of such a statute must transact in the state "some substantial part of its ordinary business, which must be continuous in the sense that it is distinguished from merely casual or occasional transactions, * * * . Hence it may be laid

76

down as a general rule that the action of a foreign corporation in entering into one contract or transacting an isolated business act in the state does not ordinarily constitute 'the carrying on or doing of business' therein." 12 R. C. L. 69, cited in Plew v. Board, 274 Ill. 232, 236, 113 N. E. 603, to the proposition that "entering into one contract or transacting an isolated business act is not engaging in business in this state."

The conclusion therefore is irresistible that § 95, in its reference to "foreign corporations entitled to transact business in this State at the time this Act takes effect," does not refer to or include a foreign corporation there engaged in interstate business or isolated single transactions. The transactions of the Fosston company here involved were of that nature. Hence they are not affected at all by the general corporation act of Illinois.

By an act approved June 19, 1925 (Laws of Ill. 1925, p. 452), § 4 of the old interest statute was amended by the addition of a proviso to the effect that "with respect to money loaned to or in any manner due and owing from a corporation, the parties may stipulate or agree upon any rate of interest whatsoever, and take and pay the same." That amendment was subsequent to the transactions now involved and therefore has no effect upon them. It is relevant only as an aid in construing the law as it was before the amendment.

It follows that the loans in question were subject to Smith-Hurd, Ill. Rev. St. 1923, c. 74, and that they were usurious to the extent that more than interest at seven per centum per annum was taken. There is no objection, as we understand the case, to certain charges made by the lender to cover expenses incurred by him in making the loan. The commissions he exacted were usurious.

Deciding as we do that as Illinois contracts the notes to Bloss & Company were enforceable only to the extent of principal and seven per cent interest, the maximum legal rate in Illinois, it remains to determine the effect in that state of the sale made by Bloss & Company under the claim that the notes were enforceable for the full amount notwithstanding their violation of the Illinois statute. The commission or bonus on the $30,000 loan was $4,650; that on the

$14,000 loan, $2,030. Both were additional to interest at the maximum rate of seven per centum. The sale of the bonds was on the theory that the notes which they secured were enforceable for par value. That theory was erroneous and the amount claimed to be due excessive accordingly. It may be that if, as of the date of the sale, the borrower had been given the credit to which he was entitled because of his payment of the usurious commissions, or if the original principal of the loans had been computed at the correct amount (face of the notes less the usurious bonuses) and proper credit given for subsequent payments, there would have been, at the date of the sale, no default and therefore no right to sell the collateral. But that issue we do not decide. It was not decided below and has not been argued here. It should be the only subject of a new trial. Another trial of the whole case is not needed.

The conclusions of law should be amended so as to conform with this decision. The new trial, if counsel cannot dispense with it, will be limited to the issue just suggested. In so far as it determines the rights of appellant Baker and not otherwise, the judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

## AFTER REARGUMENT.

On March 9, 1928, the following opinion was filed:

STONE, J.

There has been a reargument of this case, not because of any objection of counsel to what was in the former opinion, but because of their view that it did not go far enough. They ask a decision which will dispose of the case finally. Our further consideration has led us to the conclusion that we should comply. The issues of fact remaining are apparent rather than real and to be solved by reference to controlling facts already established and largely by mere computation. Our further conclusions in the case are really matters of law. Counsel are right in saying that, in the interests of the litigants and a speedy end of the case, we should obviate the necessity for very much in the way of further proceedings below.

4. The retained bonuses were usurious and forfeited by the lender pursuant to the Illinois law construed in our former opinion. Their amount was never received by the borrower, and so they must go in reduction of the loan as made rather than in payment of it afterwards. The bonus on the $30,000 loan was $4,650 and that on the $14,000 loan, $2,030. Applying them in reduction of the loans puts the latter at $25,350 and $11,970, respectively. That reduction of principal probably should have gone to the lessening of all the instalments pro rata. The debtor could have asked no more favorable disposition. The bonuses were not a payment, and so there was no right to elect how they should be applied.

But the next question is one of application of payments. Nine monthly instalments were paid, as called for, on the $30,000 note. They were without allowance for any reduction by reason of the bonus. So each payment was more than was due at the time. Were the question before us of what application to make of the excess, the parties themselves having made none, the most we could do for the debtor would be to apply it in reduction of the payment next maturing. That would comply with the general rule that payments will be applied by the law to the items which are earliest in point of time. 21 R. C. L. 103; 5 Dunnell, Minn. Dig. (2 ed.) § 7458. Furthermore, it would be logical and consistent with what good business sense probably would have required at the time in the interest of the debtor. We are not at liberty to make an arbitrary and unreasonable application of such payments simply to help the debtor.

These questions we mention only to indicate the utmost extent to which we might go in an effort to negative the existence of default on April 24, 1924, when the pledged bonds were sold. However the situation may be considered, there is no escaping the conclusion that there was a default which, under the contract of pledge, justified the sale. No proper method of computation escapes a default on the $30,000 note. No payments had been made on the $14,000 note. Even as reduced by the bonus, payments were due thereon which had not been made. That was enough under the collateral contract to authorize the sale. That contract did not require notice

or that notice if given should state the amount due or claimed to be due. It is therefore immaterial, in the absence of fraud or prejudice, that the sale was made upon a claim excessive as to the amount due. Kerfoot v. Billings, 160 Ill. 563, 43 N. E. 804; Fairman v. Peck, 87 Ill. 156; Hamilton v. Lubukee, 51 Ill. 415, 99 Am. D. 562. The sale was for substantially less than the amount due, and there is no suggestion that the borrower was prejudiced by the creditor's erroneous and exaggerated assumption as to the latter. The implications of both record and argument are to the contrary. The right of the pledgee to sell the bonds was conferred not by law but by the contract. Peacock v. Phillips, 247 Ill. 467, 93 N. E. 415, 32 L.R.A.(N.S.) 42; Palmer v. Mutual Life Ins. Co. 114 Minn. 1, 8, 130 N. W. 250, Ann. Cas. 1912B, 957. We cannot find that the contract was broken. The law of Illinois is controlling and we find nothing therein to invalidate the sale.

5. There having been a default which justified a sale of all the collateral, and the sale being otherwise unimpeachable, it remains to determine what rights it gave appellant Baker. It matters not, as we have already observed, that he may have been the representative of Bloss, for the latter had the contract right to purchase the pledged bonds, had he so elected, on his own account. In that situation it would have been immaterial, for present purposes, had the pledgee himself been the purchaser. In re Waddell-Entz Co. 67 Conn. 324, 336, 35 A. 257. The question is whether Baker may now enforce his bonds, in the pending foreclosure of the underlying trust deed, on the basis of their full par value of $75,000 and interest, or whether they will stand only for the amount of the original debt for which they were security. Again the Illinois law is controlling, and it is that:

"There is an exception to the doctrine that one seeking to enforce in equity a mortgage security is subject to any defense which would have been good against the mortgage in the hands of the mortgagee. That is the case of corporation bonds * * * [which] are issued for the purpose of raising funds for the corporation and are intended to be thrown upon the market and to pass from hand to hand.

The mortgage or trust deed secures the holders of the bonds, and they can be enforced by such holders for the full face value, regardless of equities. To permit equitable defenses to be interposed would practically destroy such methods of raising money, and the corporation is properly estopped to deny its liability." Peacock v. Phillips, 247 Ill. 467, 474, 93 N. E. 415, annotated, 32 L.R.A.(N.S.) 42.

That is controlling and disposes of this case. It makes no difference that the bonds were not negotiable. They were corporate obligations of the kind referred to in Peacock v. Phillips, 247 Ill. 467, 93 N. E. 415, 32 L.R.A.(N.S.) 42, and that is enough. That case follows the rule of the federal courts. Rogers Brown & Co. v. Tindel Morris Co. (D. C.) 271 F. 475; Turner v. Metropolitan Trust Co. (C. C. A.) 207 F. 495; Mississippi Valley Trust Co. v. Railway Steel S. Co. (C. C. A.) 258 F. 346. See also In re Woods, Weeks & Co. 52 Md. 520.

A contrary view is expressed in Dibert v. D'Arcy, 248 Mo. 617, 643, 154 S. W. 1116, 1123, where the holding is (following In re Waddell-Entz Co. 67 Conn. 324, 35 A. 257) that, under such circumstances as we have here, the pledged notes or bonds "may be treated as collateral to the indebtedness so far as is necessary to give the creditor * * * the benefit, with respect to his indebtedness, of the lien upon the mortgaged property." Under that rule Baker could enforce his bonds only to the extent of collecting the amount due on the original debt to Bloss & Company, whereas, under the rule of Peacock v. Phillips, 247 Ill. 467, 93 N. E. 415, 32 L.R.A.(N.S.) 42, he will be entitled to enforce them regardless of the original debt and according to their own terms on the basis of their par value. The doctrine of Dibert v. D'Arcy, 247 Mo. 617, 154 S. W. 1116, in practical result, disables a pledgee from selling the bonds of his debtor which have been pledged with him, although he has been given that right by a contract legally unobjectionable. That power, absolute and unconditioned as it is ordinarily, contemplates a sale and nothing less, and that good title shall be vested in the purchaser. But under the rule of Dibert v. D'Arcy, 248 Mo. 617, 154 S. W. 1116, there can be no power of sale in the real sense,

but only the power, although the form of a sale be resorted to, of a bare assignment by the creditor of his right to use the collateral for the purpose of collecting his debt. Therefore, while that rule may achieve equity and avoid harsh results in given cases, it does seem to thwart the plain purpose of a lawful contract and to be in opposition to current, lawful practices and purposes of business. Be that as it may, here it is the Illinois rule of Peacock v. Phillips, 247 Ill. 467, 93 N. E. 415, 32 L.R.A.(N.S.) 42, that must control. It follows that by their sale as a pledge appellant Baker got an unimpeachable title to the bonds and may enforce them accordingly.

The briefs indicate that there are outstanding $140,000 of the bonds, secured by the trust deed under foreclosure. Of them appellant holds $75,000, par value. Appellant is therefore entitled to a share in the security and the proceeds of foreclosure represented by the fraction, 75/140. His bonds will not be considered as having drawn interest previous to the making of the loan as security for which they were pledged. Otherwise the matter of interest will remain for adjustment agreeably to the judgment of the district court.

The case is remanded for further proceedings not inconsistent with our former opinion as supplemented by this one.